## JAMES HOOPER *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

A ship registered at the custom-house in, and *sailing out* of the port of Baltimore, owned by a *bona fide* and *actual* resident of Baltimore county, having his place of business, as a merchant, in the city, is not liable to pay taxes to the city for municipal purposes.

A vessel thus situated is not, within the meaning of the tax law of 1852, ch. 337, "*permanently located elsewhere within the State*" than at the domicil of the owner, but is subject to the general rule of the common law, that personal property has *no locality* other than that of the *domicil* of the owner.

By the laws of congress, the registration district of which Baltimore is the port of entry, is not confined to the limits of Baltimore city, and the fact

that a vessel is *registered* at the custom-house in Baltimore, gives to the city no more right to tax her than to any other part of the district.

Statutes are to be construed in reference to the *principles* of the *common law;* it is not to be presumed, that the legislature intended to make any innovation upon the common law, further than the case absolutely requires, but the law rather infers, that the act did *not* intend to make any alteration other than what is *specified,* and besides *what has been plainly pronounced.*

APPEAL from the Superior Court of Baltimore city.

This is an appeal from a *pro-forma* judgment of the court below *(Lee, J.)* The question presented by the statement of facts is, whether a ship duly registered in and sailing out of the port of Baltimore, owned by a *bona fide* and actual resident of Baltimore county, having his place of business, as a merchant, in Baltimore city, is liable to city taxation?

The cause was argued before LE GRAND, C. J., ECCLESTON, TUCK and BARTOL, J.

*S. T. Wallis* and *A. S. Ridgely* for the appellant:

The act of 1812, ch. 191, exempted licensed vessels from all taxes whatsoever, and by the 60th section of the act of 1841, ch. 23, vessels paying licenses to the general government were exempted from taxation for *county* or *city. purposes,* but this exemption was repealed by the act of 1845, ch. 354, sec. 2, so far as respects taxation for *city purposes.* By the act of 1852, ch. 337, sec. 9, which, in this respect, is similar to the previous law of 1841, ch. 23, sec. 9, it is provided, that "all property owned by residents of this State, and *not permanently located elsewhere within the State,* shall be assessed to the owner in the county or city where he or she may reside," and the question in this case is, whether this vessel comes within the exception of property *"permanently located elsewhere within the State?"* It is admitted, that the owner is a *bona fide* and *actual* resident of Baltimore county, and the general rule of law that the *situs* of the owner's domicil is the *situs* of all *personal property* belonging to him, undoubtedly applies unless modified or repealed by the act in question. In

*Story's Conflict of Laws, secs.* 379 to 382, the reason, policy and universality of this general doctrine is clearly stated, and has been fully recognised by this court in *Newcomer vs. Orem,* 2 *Md. Rep.,* 305, and in *Chauvenet vs. The Commissioners of Anne Arundel county,* 3 *Md. Rep.,* 264, which was a case in which the rule was applied in reference to taxation.   In the cases of *Harvard College vs. Gore,* 5 *Pick.,* 377; *Salem Iron Factory vs. Inhabitants of Danvers,* 10 *Mass.,* 520; *Gray vs. Kettell, et al.,* 12 *Mass.,* 162, and *Amesbury Woollen & Cotton Manf. Co., vs. Inhabitants of Amesbury,* 17 *Mass.,* 462; it was held, that, as a general rule, the owner is taxable for personal property in the town in which he dwells, no matter whether such property be found in that town or any other, and that this general proposition is proved by the exception introduced into the tax laws of that State, which *expressly* make the owners of goods and merchandise, &c., who hire shops and stores, &c., and carry on their business in other towns than those in which they dwell, liable to be taxed for such goods in the towns where their business is negotiated. The language of their acts is, "that for such goods, &c., or other stock in trade including stock employed in manufactories, *ships or vessels* as are *sold, used* or *improved* in any towns, &c., other than where the owners thereof dwell, such owners shall be respectively taxed therefor in *such towns,* &c., and *not where they dwell or have their home."* The court will perceive that the language of this exception is clear and express, and entirely different from that in our act of 1852. In the cases of *The Draco,* 2 *Sumner,* 189, and *Leland, et al., vs. The Ship Medora,* 2 *Wood. & Minot,* 115, it was held, that the rule applies to the general transfer of property, according to the laws of the State, without regard to acts of Congress.

The question then recurs, what is meant by the words "permanently located elsewhere within the State?" It is supposed on the other side, that the fact, that the vessel was registered at the custom-house in Baltimore city, gives it a *permanent location* there.   But this can have no such effect, for according to the existing laws of Congress, it could be reg-

istered no where else, so long as the owner resides where he now does, (Acts of Congress of 1792, ch. 1, sec. 3; 1798 ch. 8, sec. 2, and 1850, ch. 27, sec. 1,) and by the act of 1799, ch. 22, sec. 10, the registration district of which Baltimore is the *sole* port of entry, is not confined to the limits of Baltimore city, but includes "Patapsco River, Turkey Point, Spes Utiæ Island, and all the waters and shores on the west side of Chesapeake Bay, from the mouth of Magetty river, which shall not be included in the district of Havre-de-Grace." According to these laws the registry must be in Baltimore city, though the owner resides in Baltimore county, or any part of Anne Arundel, Howard or Harford counties embraced within the limits of the registration district. The registry cannot, therefore, be said to give the vessel a *"permanent location"* in Baltimore city. Ships and vessels are *in fact* permanently located nowhere, and there is no reasonable ground for presuming, in direct opposition to the fact, that they are to be held in law as located at the port of entry where they are registered or enrolled. The very purpose and objects of commerce forbid this. Registry and enrollment are for national purposes exclusively, and are so far from implying permanent location, that vessels registered and enrolled may lawfully leave the port to which they belong without ever returning to it again. They may, in fact, if they are enrolled vessels, be permanently located in another State, and carry on commerce exclusively in its waters. They may, if registered, sail altogether from and to the ports of another State. They are therefore, more properly than almost any other sort of chattels, within the reasonable rule in regard to taxation, that personal property follows the *situs* of the owner. If the rule were otherwise, the result would be to exclude all the citizens of Maryland from the privilege of being interested in the commercial marine of their chief port of entry, except upon the condition of contributing to pay the municipal debts of Baltimore city. In the case of *Hays vs. The Pacific Mail Steam Ship Company*, 17 *How.*, 596, it was held, that the State of California had no right to tax a vessel, temporarily in San Francisco, engaged in lawful trade, and duly registered in the *city*

*of New York,* where her owners resided, and it was there said, that the *situs* of such a vessel was her *home-port,* where she belonged and where the owners were liable to be taxed for the capital invested. But the circumstances of that case are entirely different from this, and even if the *situs* of this vessel could be said to be her home-port where her owners resided, it would not locate her in Baltimore city, any more than in any other part of the registration district of which Baltimore is the port of entry.

Again, various provisions in the acts of 1841 and 1852, show that the legislature did not intend to embrace such property as this within the words, "permanently located elsewhere within the State." We refer to the provisions of the 12th, 13th and 63rd sections of the act of 1841, and particularly to the 16th section, which makes the stock of *non-resident* stockholders, in banking or other moneyed corporations situated, for the purposes of taxation, *at the place at which the principal office* for transacting the business of such corporation is *situated.* There are also similar provisions in the act of 1852. See, also, the acts of December session 1841, ch. 281, 1843, ch. 289. Again, by the 2nd section of the act of 1841, Baltimore city is divided into various assessment districts, and this vessel would be returned by the assessors of that district in which the owner resided, if he resided in the city at all, though the vessel might, in fact, be in another assessment district, and if this is admitted, as it must be under the provisions of the 12th section of the same act, it is because the *situs* of the owner draws to it the personal property of the owner.

*H. R. Dulany* and *G. L. Dulany* for the appellee:

It is admitted that personal property, as a general rule, must be taxed where the owner resides, but it is insisted that such property, when "permanently located elsewhere within the State," must be assessed to the party by the assessors of that place in which it is situated. This position is based upon the 9th section of the act of 1852, ch. 337, which supersedes the corresponding section in the act of 1841, ch. 23. After making it the duty of the assessors to inform themselves, by all

lawful means, of *all* the assessable property in their respective districts, and to value the same at its full cash value; this section enacts, that "all property owned by residents of this State, *and not permanently located elsewhere within the State,* shall be assessed to the owner in the county or city where he or she may reside." A similar exception as to the place of taxation of personal property generally, has been established by the legislatures of Massachusetts and New York. 5 *Sandford*, 44. 17 *Mass.*, 461. In this case the owner is a *bona fide* and *actual* resident of Baltimore county, but has *his place of business,* as a merchant, in the city, and the vessel is duly registered at the custom-house in, and *sailing out* of the port of, Baltimore. These facts, we insist, makes the vessel "permanently located" in that city, within the meaning of those terms, as they are employed in the acts of 1841 and 1852. Those words evidently apply to *personal property,* for in the 1st section of the act of 1841, they are used in immediate connection with goods, wares and merchandise; the language of that section is: "All real and personal property in this State, all chattels real and personal, all goods, wares and merchandises, and other stock in trade, at home, or *not permanently located elsewhere.*" This clearly imports that *personal property* may have a *permanent location,* for the purpose of taxation, elsewhere than at the domicil of the owner, and that such was the meaning of the Legislature when they passed the law. What is meant by the general doctrine, that personal property has no *locality?* It does not mean that it has no *visible locality,* but it only refers to the law governing the *transfer* and *transmission* of such property. This is clearly stated in the sections in *Story's Conf. of Laws,* referred to on the other side. The word *"permanent,"* in its literal meaning, signifies *continuance* in a place for a greater or less time. When applied to real estate, it includes the idea of immobility. Blackstone applies the term to a *rent,* which is an incorporeal hereditament, and if applicable to a *rent,* why may it not also be applied to *personal property?* The word is to be taken in connection with the context in which it is used. 1 *Kent,* 252. We do not contend that the fact of *registry,* alone, gives the

right of taxation to the city, but the statement of facts includes the business residence of the owner in the city of Baltimore, and that the vessel is *trading* out of that port. The argument on the other side goes to the extent, and must go to the extent, of saying that a vessel is not susceptible of *location any where.* But this is not so. A vessel is not, like stock in a corporation, invisible and intangible, but can be seen, occupies space, is tangible and susceptible of being *located.* In the eye of the law it has a *local situs,* and if capable of having such a *situs,* that *situs* is the city of Baltimore, and it is there subject to taxation. The Supreme Court of the United States, in the case of *Hays vs. The Pacific Steamship Company,* 17 *How.,* 596, clearly say, that the *situs* of a vessel is her *home-port,* and that she is liable to be taxed there—her home-port is her *situs* for the purpose of taxation. The home-port of this vessel is the port of Baltimore, and it is there she is *"permanently located,"* within the meaning of the tax laws of the State.

I.e GRAND, C. J., delivered the opinion of this court.

This is an appeal from a *pro forma* judgment of the Superior court for Baltimore city, on the following statement of facts:

"It is admitted in this case that the defendant is a *bona fide* and actual resident of Baltimore county, but having his place of business, as a merchant, in the city, and that this action is instituted to recover from him the sum of five hundred and five dollars, being the amount duly assessed in the city of Baltimore, as city taxes on the ship Anne E. Hooper, the property of the defendant, registered in the custom-house at said city, and sailing out of the port of Baltimore. It is agreed that the plaintiff is entitled to recover the said sum of money and costs, and that the court shall give judgment therefor, provided the court shall be of opinion that the said ship is lawfully to be valued to the said defendant, for the purposes of city taxation in the city of Baltimore, and that he may lawfully be compelled to pay city taxes upon the said ship, notwithstanding his residence in Baltimore county. It is further agreed that the plaintiff is not entitled to recover, and that the

court shall render judgment for the defendant, with costs, provided the court shall be of opinion that the said ship should be valued to the defendant, and that he should be taxed thereupon in the county where he resides.

"It is agreed that either party may have an appeal from the judgment of the Superior court, and that the said court may make inferences of fact, in their discretion, from the facts herein stated. It is further agreed that the Court of Appeals may, in case of appeal, render such judgment upon this statement and such inferences, as they may deem according to law."

The question presented by this statement of facts is simply this: is a vessel owned under the circumstances detailed, liable to pay taxes, for municipal purposes, to the city of Baltimore?

It is claimed, on behalf of the city, that such liability exists because of the provisions of the act of 1841, chapter 23, sec. 9, and of those of the act of 1852, chapter 337, sec. 9. The words of the latter, so far as this question is involved—and they are the same as in the former act—are as follows: "All property owned by residents of this State, *and not permanently located elsewhere within the State,* shall be assessed to the owner in the county or city where he or she may reside."

It is urged that notwithstanding the owner of the ship Anne E. Hooper "is a *bona fide* and *actual* resident of Baltimore county," she is liable to taxation for city purposes, because she is registered in the custom-house at said city, and is "sailing out of the port of Baltimore," and because she is *"permanently* located elsewhere *within the State"* without the limits of Baltimore *county,* the domicil of her owner.

It was on the union of all these circumstances, and not on any one in particular, it was contended she was liable to city taxation. First, then, as to the effect of her registration at the custom-house, in Baltimore. We attach—and we also understood the counsel for the city to attach—but slight importance to this fact. Under the existing laws of Congress, so long as Mr. Hooper owns the vessel, and retains his residence in Baltimore county, she can be registered nowhere else than at the custom-house, in Baltimore city.

By the act of Congress of the 2nd of March 1799, entitled

"An act to regulate the collection of duties on imports and tonnage," it is provided "that in the State of Maryland there shall be ten districts," and that "the district of Baltimore shall include Patapsco river, Turkey Point, Spes Utiæ Island, and all the waters and shores on the west side of Chesapeake Bay, from the mouth of Magetty river, which shall not be included in the district of Havre-de-Grace; and a collector, naval officer and surveyor for the district shall be appointed, to reside at Baltimore, which shall be the sole port of entry." And by the act of Congress of December 31st, 1792, it is provided that every ship or vessel to be thereafter registered, "shall be registered by the collector of the district in which shall be comprehended the port to which such ship or vessel shall belong at the time of her registry, which port shall be deemed to be that at or nearest to which the owner, if there be but one, or if more than one, the husband or acting and managing owner of such ship or vessel usually resides. And the name of the said ship or vessel, and of the port to which she shall so belong, shall be painted on her stern," &c.

Under these acts of Congress, it is clear that the Anne E. Hooper could only have been registered at the custom-house in Baltimore, and she, in consequence of such registration, was made to belong to that port, but the district of which that is the port, as is palpable from the language of Congress, is not confined to the limits of the city.

The circumstances principally relied upon by the city, were the fact of sailing out of the port of Baltimore, and that she was "permanently located" elsewhere than at the place of residence of the owner. If, in one sense, as was said in the case of *Hays vs. The Pacific Mail Steamship Co.*, 17 *Howard's S. C. Rep.*, 596, a vessel engaged in foreign trade can have a domicil, it must be regarded as that of the home-port, which, as we have seen in the present instance, may extend over a much larger territory than the limits of the city; and it would therefore be just as proper for Baltimore county or Anne Arundel county, as for the city of Baltimore, to impose a tax for municipal purposes, for all of the one, and a part of the other, is embraced within the district of which the city of Baltimore

is the port of entry. If, therefore, there was no other consideration affecting the case, the city would clearly have no right to tax, she being in no better condition than the other portions of the registration district. But, in truth, the whole question depends upon the meaning of the words of the act of 1852. It cannot be denied, nor was it, that as a general principle, all personal property, unless affixed to the freehold, is, in contemplation of law, without a location, *other* than the residence of its owner. Wherever he or she may reside, there is, by operation of law, located the property. In this particular the rule being different from that applicable to realty. In the one case the domicil of the owner determines the law, whilst in the other the law of the *rei sitæ* governs. So universal is the recognition of this distinction, that it can scarcely be necessary to cite authorities in its support. It is the law of nations. Lord Loughborough, in *Sill vs. Worswick*, 1 *Hen. Bl. Rep.*, 690, has said, "it is a clear proposition, not only of the law of England, but of every country in the world, where law has the semblance of science, that personal property has no locality. The meaning of that is, not that personal property has no visible locality, but that it is subject to that law which governs the person of the owner, both with respect to the disposition of it, and with respect to the transmission of it, either by succession or by the act of the party. It follows the law of the person. The owner, in any country, may dispose of his personal property. If he dies, it is not the law of the country in which the property is, but the law of the country of which he was a subject, that will regulate the succession." And Lord Chief Justice Abbott said: "Personal property has no locality. And even with respect to that, it is not correct to say that the law of England gives way to the law of the foreign country; but that it is part of the law of England that personal property should be distributed according to the *jus domicilli*." Justice Story, after treating of the history of this rule, in *section* 379 of his work on the *Conflict of Laws*, says: "If the law *rei sitæ* were generally to prevail in regard to movables, it would be utterly impossible for the owner, in many cases, to know in what manner to dispose of them during his life, or to distribute

them at his death, not only from the uncertainty of their situ-
ation in the transit to and from different places, but from the
impracticability of knowing, with minute accuracy, the law of
transfer," &c. Again: "Any change of place at a future
time might defeat the best considered will, and any sale or
donation might be rendered inoperative from the ignorance of
the parties of the law of the actual *situs* at the time of their
acts. These would be serious evils pervading the whole com-
munity, and equally affecting the subjects and the interests of
all civilized nations. But in maritime nations, depending upon
commerce for their revenues, their power and their glory, the
mischief would be incalculable. A sense of general utility,
therefore, must have first suggested the doctrine, and as soon
as it was promulgated, it could not fail to recommend itself to
all nations by its simplicity, its convenience and its enlarged
policy." These references are abundantly sufficient to show
the rule and its policy. They might be multiplied to almost
any extent.

Although the general rule is as we have stated it to be, yet
it is perfectly competent to the sovereign authority to abolish or
modify it, and the question here is: has it been so modified as
to bring this vessel within the taxing power of the corporation
of Baltimore? The words of the act are, "All property owned
by residents of this State, and not permanently located else-
where within the State, shall be assessed to the owner in the
county or city where he or she may reside."

Apart from the general principle to which we have adverted,
it may be very properly doubted whether a vessel built for and
actually employed in foreign trade, can be said to be *"perma-
nently"* located any where. The idea of its *permanent* loca-
tion is at war with the very purpose of its creation. Vessels
are not constructed to rot at the wharf or dock, but to carry,
from place to place, cargo; their very use necessarily implies
transition—the absence of permanency of locality. Besides,
under our act of Assembly, to take personal property out of
the general rule, so far as taxation is concerned, it must be
"permanently located elsewhere *within the State*" other than
within the county or city of the residence of its owner. The

ship in this case, clearly, is not permanently located *"within this State."* Her mission is on the seas:—

> "Her march is o'er the mountain wave,
> Her home is on the deep."

The desire on the part of the tax-payers of a city to subject the personal property of non-residents, who transact their business within its limits, to a proportionate share of its burdens, is far from unreasonable; but this desire cannot be gratified unless the legislative will allows it, and this permission is not to be gathered by conjecture, but from the plain and unequivocal language in which it should be expressed. In *Dwarris on Statutes* it is said, at page 695, "As a rule of exposition, statutes are to be construed in reference to the *principles* of the common law. For it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the act did *not* intend to make any alteration *other* than what is *specified*, and besides *what has been plainly pronounced.*"

If the legislature hereafter should deem it wise and just to subject property held as is the vessel in question to city taxation, it can adopt the policy of New York and Massachusetts, but until it does do so in plain and unmistakable terms, the courts must adhere to the long established doctrine.

Being of opinion that the vessel, Anne E. Hooper, is not liable to city taxation under the authority given in that event by the case stated, we reverse the judgment of the court below, and enter judgment for the appellant, with costs.

*Judgment reversed.*

(Decided January 6th, 1859.)