513 A.2d 923

**Audrey BLUCHER**

v.

**Doris Jean EKSTROM.**

**No. 249, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Sept. 4, 1986.

Thomas J. Dolina (Thomas G. Bodie and Power & Mosner, on the brief), Towson, for appellant.

Charles E. Stoner, Westminster, for appellee.

Argued before GILBERT, C.J., and BISHOP and KAR-
WACKI, JJ.

GILBERT, Chief Judge.

There is, as far as we know, no legal maxim that states,
*"Si causam actionis non potes invenire, causam excog-
nite"* (If there is no cause of action, invent one), but in
today's litigious society the apothegm should exist because
that seems to be the order of the day.  The instant case is
illustrative of the point.  Specifically, we are asked to
declare that the statutory duty on an adult child to support
a destitute parent creates a concomitant cause of action
entitling the adult child to recover compensation from the
party who injured the adult child's parent.

### The facts

This appeal has proceeded in accordance with Md.Rule
1029 (Expedited Appeal).  Accordingly, the parties sub-
mitted an "Agreed Statement of the Case."  It reads:

"On February 13, 1984, the Appellant, AUDREY
BLUCHER, was operating her motor vehicle on Maryland
Route 482.  Her mother, Betty Hoyer, was a passenger.

The vehicle was struck by the vehicle operated by the
Appellee, CARROLL LEE EKSTROM, and owned by
Appellee, DORIS EKSTROM, resulting in injuries to both
Audrey Blucher and Betty Hoyer.

Betty Hoyer was taken to Sinai Hospital where she was
placed in the intensive care unit.  Her initial diagnosis
summarized by Dr. Ronald Cohen was a very complex
distal femur fracture, fractures in both wrists, and closed
head injuries.

With therapy at Sinai, Ms. Hoyer began to feed herself
and was able to verbalize slightly.  With the discharge
date approaching, her attending physician discussed with
Ms. Hoyer's family, including Audrey, the alternatives
for professional care after discharge.

The family realized that more financial burdens would
follow if Ms. Hoyer was to receive the necessary care and

treatment at a private facility. Their only alternative short of selling their home and obtaining State assistance would be to attempt the long process of care and rehabilitation at the family home.

Prior to the automobile accident, ... AUDREY BLUCHER (then known as Audrey Hoyer), was employed as a registered nurse (medical and surgical) with St. Joseph's Hospital. Audrey's sister was also employed as a registered nurse and as such both had the professional skills to provide home care for their mother.

A plan for Betty Hoyer's home care was devised with the help of Dr. Rosenberg, the family's physician. In his report of August 27, 1984, Dr. Rosenberg states "Mrs. Hoyer remains essentially totally disabled ... [Betty Hoyer] continues to require 24–hour attention as far as nursing care, supplemented by continued speech therapy, occupational therapy and physical therapy ... maximal rehabilitation will still leave her considerably dependent with limited capability and ambulating and capacity for self-care".

Betty Hoyer was discharged from Sinai Hospital on April 13, 1984, and Audrey began providing constant nursing care to her mother with weekly to bi-monthly supervision by Home Health Nursing. However, on April 30, 1984, Betty Hoyer was released by that program for reasons stated by Jean Thornton, R.N. that Audrey was providing appropriate nursing care and managing her mother's nursing needs without difficulty. Physical therapy, speech therapy and occupational therapy continued.

In order to provide the necessary constant care to her medically disabled mother, Audrey was forced to leave her nursing position and employment with St. Joseph's Hospital, suffering a total loss of income.

AUDREY BLUCHER filed suit against CARROLL LEE EKSTROM and DORIS EKSTROM, alleging negligence, reckless entrustment, and in Count III, a separate and distinct action for recovery of her lost wages as a

result of providing the necessary medical care to her mother.

AUDREY BLUCHER alleged in the Court below that she had a duty under the *Family Law Article* of the *Maryland Annotated Code,* Section 13,102 [sic] to care for her mother because of her mother's financial inability to provide for her own care.

Ms. Blucher further alleged that such a statutory duty grants her the right to recover any losses incurred as a result of performing that statutory duty against the original tortfeasor.

Defendants filed a general denial with a Motion to Dismiss as to Count II's claim for punitive damages, and Count III's claim for damages as a separate and distinct cause of action.

Argument was heard before Judge Donald Gilmore in the Circuit Court for Carroll County on December 23, 1985. After consideration, Judge Gilmore reserved Defendants' Motion to Dismiss as to Count II, but granted the Motion as to Count III without leave to amend. Judge Gilmore's decision was finalized by Order dated March 18, 1986 in compliance with Maryland Rule 2–602."

To an agreed statement we append the additional fact that Mrs. Hoyer's claim against the Ekstroms was settled. She executed a joint tortfeasor release which provides that in consideration of the payment of $120,000 she "released and forever quit claimed" the appellee Carroll Ekstrom.

### The Law

According to Sir William Blackstone, the obligation of "children to provide for their father when fallen into poverty" was found in the Athenian laws. II Blackstone Commentaries on the Law of England 454. By Act of Parliament the duty to support a destitute parent became the law of England. *See* 43 Eliz. I Ch. 2 § 7 (1601).[1]

---

**1.** The Act provided:

In Article 5 of the Declaration of Rights to the State Constitution it is provided "that the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, ... and to the benefit of such of the English statutes as existed on the Fourth of July, seventeen hundred and seventy-six." Thus the rationale, if not the letter, of the Statute of 43 Eliz. I Ch. 2 § 7 found its way into the Maryland Code. Formerly an integral part of the criminal law statute of the Code,[2] the present statute is now found in Md.Fam.Law Code Ann. § 13–102(a). It provides: "If a destitute parent is in this State and has an adult child who has or is able to earn sufficient means, the adult child may not neglect or refuse to provide the destitute parent with food, shelter, care and clothing."

"Destitute parent" is defined to mean one who: "(1) has no means of subsistence; and (2) cannot be self-supporting, due to old age or mental or physical infirmity." Md. Fam.Law Code Ann. § 13–101(c).

---

"VII. And be it further enacted, That the father and grandfather, and the mother and grandmother, and the children of every poor, old, blind, lame and impotent person, or other poor person not able to work, being of a sufficient ability, shall at their own charges, relieve and maintain every such poor person in that manner, and according to that rate, as by the justice of peace of that county where such sufficient persons dwell, or the greater number of them, at their general quarter-sessions shall be assessed; (2) upon pain that every one of them shall forfeit twenty shillings for every month which they shall fail therein."

2. Former Art. 27, § 104 provided:

"Any person having a parent or parents within this State, such parent or parents being destitute of means of subsistence and unable either by reason of old age, infirmity or illness to support himself or herself, who is possessed of or able to earn means sufficient to provide such parent or parents with necessary shelter, food, care and clothing, and neglects or refuses so to do, shall, upon conviction thereof, be deemed guilty of a misdemeanor, and, upon conviction in any court of the State having original jurisdiction, shall be punished by a fine not exceeding $500.00 or imprisonment in the Maryland House of Correction for not more than one year, or both, in the discretion of the court."

This section was repealed by Laws 1984 Ch. 296, § 1, effective October 1, 1984.

Ms. Blucher seizes upon the statutory duty of support and fuses it to the old maxim that a single tortious act may give rise to more than one cause of action. Based on that merger, she then concludes that an adult child may recover damages from the party who causes physical infirmity to his or her parent.[3] The purpose of Md.Fam.Law Code Ann. § 13–102(a) is not to create a cause of action on behalf of adult children of a disabled parent but, insofar as possible, to remove destitute parents from public support and to place responsibility for their upkeep on their adult children. The criminal sanctions imposed by the legislature are a recognition of the fact that not all adult children will voluntarily support their destitute parent or parents. In order to encourage compliance with the legal requirement of support, the General Assembly has enacted a penal provision for noncompliance.[4]

The Court of Appeals cautioned in *Gregg v. Gregg,* 199 Md. 662, 670, 87 A.2d 581, 584 (1952), "that any change in the common law rule had to be made by *express legislative mandate.*" (Emphasis in original.) *See also Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 355 (1934), and *Hooper v. Mayor & City Council of Baltimore,* 12 Md. 464 (1859). In *Hooper,* 12 Md. at 475, the Court, quoting from Dwanes on Statutes, said:

"As a rule of exposition, statutes are to be construed in reference to the *principles* of the common law. For it is not to be presumed that the Legislature intended to make any innovation upon the common law, further than the

---

3. Because each child is responsible for supporting his or her destitute parent, the question immediately arises as to whether each child may recover from the parent's tortfeasor. If that possibility exists, then it would appear to follow that when a person who is a parent is injured as the result of an allegedly tortious act, the tortfeasor would be compelled to obtain a release from each child of the injured parent.

4. The statute provides that any one who violates it is guilty of a misdemeanor. He or she is subject to imprisonment for not more than one year or to a fine of not more than $1000.00 or to both fine and imprisonment.

case absolutely required. The law rather infers that the Act did *not* intend to make any alteration *other* than what is *specified,* and besides *what has been plainly pronounced."* (Emphasis in original.)

The *Lutz* Court cited with approval to that particular passage of *Hooper. Lutz* also quoted 25 R.C.L. 1054 to the effect that:

"The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory." *Lutz,* 167 Md. at 15, 172 A. at 355.

Although Blucher has referred us to a number of cases [5] supporting her argument that an adult child may recover damages as a result of injury to the child's parent, we find them inapposite. All are concerned with the right *vel non* of a spouse to recover for nursing care from her injured husband's workmen's compensation carrier. *See* e.g., *A.G. Crunkleton Electric Co. v. Barkdoll,* 227 Md. 364, 177 A.2d 252 (1962). In *Crunkleton,* 227 Md. at 371, 177 A.2d at 256, the Court observed that the Workers Compensation Act, Md.Ann.Code art. 101, § 37 "simply holds the employer liable for 'nurse and hospital services.'" The Court commented that Mrs. Barkdoll's nursing services "were not minor in character but were extraordinary, unusual, and clearly above and beyond the call of any marital obligation."

---

**5.** *See Bushell v. City of Duluth,* 241 Minn. 189, 62 N.W.2d 813 (1954); *Graf v. Montgomery Ward & Co.,* 234 Minn. 485, 49 N.W.2d 797 (1951); *Galway v. Doody Steel Erecting Co.,* 103 Conn. 431, 130 A. 705 (1925); *Claus v. DeVere,* 120 Neb. 812, 235 N.W. 450 (1931), *ovrld., Spiker v. John Day Co.,* 201 Neb. 503, 270 N.W.2d 300 (1978), all of which are cited in *A.G. Crunkleton Electric Co. v. Barkdoll,* 227 Md. 364, 370, 177 A.2d 252, 255 (1961).

Moreover, the cases relied upon by Ms. Blucher are grounded in a particular worker's compensation statute. The instant case, contrary to Blucher's view, is not bottomed on a statute. It is, in the final analysis, nothing more than a bold attempt to convert a historical, societal duty into a cause of action—for which the parent has already settled with the tortfeasor.

Ordinarily, a cause of action grounded in tort is personal to the party who suffered damages as a direct consequence of the tortious act. There are, of course, exceptions which include: a parent's right to sue an adult to recover for wrongful death of a minor child, Md.Cts. & Jud.Proc.Code Ann. § 3–904(a); the surviving spouse's ability to sue for the wrongful death of the other spouse, Md.Cts. & Jud. Proc.Code Ann. § 3–904(a); a surviving child's seeking to recover for the wrongful death of his or her parent, Md.Cts. & Jud.Proc.Code Ann. § 3–904(d), (e); an injured worker's employer or the employer's insurance carrier's suing the tortfeasor who injured the worker, Md.Ann.Code art. 101, § 58; the maintaining of a suit by the father of an illegitimate child to recover for the death of the child, Md.Cts. & Jud.Proc.Code Ann. § 3–904(h). *See generally* Gilbert, *Maryland Tort Law Handbook*, (Michie, 1986) §§ 13.3 and 13.4.

At common law, an adult child acting on his or her own behalf was not permitted to maintain an action in tort against the party who allegedly injured the child's parent. The Legislature does not sanction such a suit. The statute carries no hidden meaning. It does exactly what it purports to do, that is, require an adult child to support a destitute parent, if the child has the ability to do so. What the act does not do is create a new tort. Judge Gilmore did not err in dismissing the action.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.