641 A.2d 889

In re ADOPTION/GUARDIANSHIP NOS. 2152A, 2153A, 2154A
IN the CIRCUIT COURT FOR ALLEGANY COUNTY.

No. 681, Sept. Term, 1993.

Court of Special Appeals of Maryland.

May 31, 1994.

Marianna I. Burt, Baltimore, for appellant.

Michael Krautner, Cumberland, for appellee, Children.

Wendy J. Greenberg, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee, Dept. of Social Services.

Argued before WILNER, C.J., BLOOM, J., and J. NORRIS BYRNES, Judge, Specially Assigned.

J. NORRIS BYRNES, Judge, Specially Assigned.

The Allegany Department of Social Services sought and obtained termination of the parental rights of Appellant, Diane W., over her three minor children. In this appeal, Ms. W. challenges the trial court's ruling by posing the following issues for review:

 I. Whether the trial court erred in ruling that the evidence presented was sufficient to support termination under the factors enumerated in Section 5–313 of the Family Law Article.

 II. Whether the expert and other testimony was sufficient to support the termination petitions.

 III. Whether a 16–year old child not wishing to be adopted is properly the subject of a termination of parental rights petition.

For the following reasons, we affirm the trial court's termination of Ms. W.'s parental rights.

## FACTUAL BACKGROUND

On May 9, 1986, the Allegany County Department of Social Services ("DSS") received a report from the Allegany County Sheriff's Department of suspected abuse of the four children of Walter F. and Diane W.: Peggy F.; Rebecca F. ("Becky"); Michelle F.; and Melinda F. ("Mindy"). At the time, the children were ages 14, 10, 8, and 5, respectively.

The source of the complaint that gave rise to the report of suspected child abuse was Ms. W. herself. Ms. W. reported that Peggy was engaging in sexual relations with Ms. W.'s nephew, Patrick. The complaint triggered an investigation of the F. household by Childrens' Protective Services. The investigation not only confirmed the relationship between Peggy and Patrick but also revealed that all four of the F. girls were being sexually abused by their father, Walter F. Moreover, the investigation revealed that Ms. W. had been present in the same room when her husband had engaged in sexual acts with daughters Peggy and Mindy.

As a result of the findings of the Childrens' Protective Services investigation, Mr. F. and Ms. W. were charged criminally and the children were removed from the household. On May 14, 1987, the children were adjudged as CINA (Children In Need of Assistance) and were committed to the custody of the DSS. Mr. F. pled guilty to a charge of second degree rape of Peggy and Mindy and was sentenced to a term of thirty years in prison. He remains incarcerated at this time.

On April 1, 1987, Ms. W. pled guilty to two charges of child abuse, one each involving Peggy and Mindy. On May 27, 1987, she was sentenced to two consecutive five-year terms. In October of 1990, Ms. W. was released on parole. As a condition of her parole, any contact that she has with her children must be supervised by the DSS.

On September 19, 1989, the DSS filed petitions for guardianship with right to consent to adoption as to Becky, Michelle, and Mindy. (Peggy had reached the age of 18 in the interim.) Mr. F. voluntarily relinquished his parental rights. Ms. W. contested the termination of her parental rights.

On March 17 and 18, 1992, the trial court conducted a guardianship hearing. Testimony was taken from all four of the F. daughters, a psychologist who had treated Mindy, a clinical social worker who had counseled all of the girls, the foster parents of the children, personnel of Childrens' Protective Services who had carried out the initial investigation of the report of suspected child abuse, the childrens' case worker, and Ms. W. In addition, transcripts from the criminal proceeding against Ms. W. and statements made by Peggy during those proceedings and during the criminal investigation were introduced into evidence.

The abuse suffered by the F. children defies comprehension. Mr. F. abused Peggy by having sexual intercourse with her and by forcing her to perform oral sex on him. This abuse started when Peggy was nine years old and did not end until she was removed from the household by the DSS. According

to Peggy, the abuse occurred frequently, "whenever [her father] had the opportunity ... like every day."

Peggy testified also that she was sexually abused by her mother, who fondled private parts of her body and forced her to engage in fondling of a sexual nature. Peggy witnessed her mother sexually abusing Michelle. Peggy also witnessed her father sexually abusing Michelle. Peggy told her mother about the abuse of the girls by their father, but Ms. W. did nothing to intervene.

Mr. F. started to abuse Michelle sexually when she was about six years old. Michelle also told Ms. W. about the abuse; one time, all of the sisters went to their mother together to complain about the abuse. Ms. W. reacted by accusing the girls of lying and "smacking" them. Michelle was physically abused by her father also; in one such incident, Mr. F. tied Michelle and her sisters to a tree in the front of their house. They were naked at the time.

Becky witnessed her father engaging in sex acts with her sister Peggy "all the time." She was eight years old when she first observed her sister and father having sex. Becky remembered seeing her father throw her younger sister Mindy down the stairs. Ms. W. was not present at the time, but she did see the resulting cut to Mindy's head.

Mindy, who was 5 years old when the DSS intervened, remembered being sexually abused by her father and seeing her father having sex with Peggy and Michelle. She also remembered all of the girls going together to their mother to tell her what their father was doing, and that their mother did not do anything in response.

Ms. W. denied that she had sexually abused her daughters. During the criminal proceeding brought against her, Ms. W. admitted that she had been present when her husband had sexual contact with Peggy and Mindy and that she did nothing to intervene on behalf of the children. Ms. W. acknowledged, during the guardianship proceeding, that she left the children alone with her husband in the evenings even though she knew that he usually came home drunk and acted violently.

After the children were removed from the F. household and were placed in foster care, they adjusted remarkably well to their new environments. Michelle, who was 14 at the time of the hearing, and is now 16, would like to be adopted by the foster parents with whom she has been living since 1986. Those parents, Mr. and Mrs. M., testified about the many emotional problems that Michelle was experiencing when she first came to them, at age 7½, and how, over the years, those problems were resolved. Mr. and Mrs. M. would like to adopt Michelle.

Mindy, who was 11 at the time of the hearing and is now 13, has lived with Mr. and Mrs. S. for more than seven years. Mindy is happy in the S. family, which she describes as consisting of her foster parents and her dog, cat and fish. Mindy would like to be adopted by Mr. and Mrs. S. Mindy's foster mother and her psychologist, Dr. James E. Miller, described Mindy's emotional and behavioral problems and the progress that she has made in coming to terms with the abuse she suffered.

Finally, at the time of the hearing, Becky, who was then 16, had been living with her foster mother, Betty S., for one year. Becky had lived in another foster home before that, but had moved because of "mutual problems." Becky testified that she wants to keep living with her foster mother, but she does not wish to be adopted.

While she was incarcerated, Ms. W. wrote letters to Becky, Michelle, and Mindy. Becky and Mindy corresponded with their mother and, after she was released from prison, started to attend supervised visits with her at the DSS offices. Becky would like to continue to see her mother; Mindy was equivocal about continuing the visits. Michelle did not correspond with her mother while she was in prison and has refused to visit with her since her release.

At the time of the hearing, Ms. W. was working as a bartender, on the night shift. She acknowledged that Mindy and Michelle want to be adopted and that all of the children would like to remain in the families where they now live. She

also acknowledged that she does not know the children, that she does not know their likes and dislikes, and that she does not know their feelings.

## DISCUSSION

## I.

## SCOPE OF REVIEW

Maryland Rule 8–131(c) governs our scope of review. That Rule mandates:

When an action has been tried without a jury the appellate court will review the case both on the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

## II.

## SECTION 5–313 TERMINATION FACTORS

Under Maryland Family Code Ann., Section 5–313(a)(2) (1991), a court may terminate a natural parent's rights without consent upon a finding, by "clear and convincing evidence," that termination is "in the best interest of the child" and that the child has been previously adjudicated a CINA. The trial court also must consider the factors set out in Section 5–313(c) and (d) and address each one, "not only to demonstrate that all factors were considered but also to provide a record for review." *In Re Adoption/Guardianship No. 87A262*, 323 Md. 12, 19–20, 590 A.2d 165 (1991).

 There is no dispute in this case that the children were previously adjudged as CINA. Therefore, Ms. W's parental rights could be terminated, without her consent, pursuant to the statute if the trial court properly found, by clear and convincing evidence, that termination of Ms. W's parental rights is in the best interest of each of the three children. In reviewing the evidence presented below to determine whether the trial court's findings were clearly erroneous,

our function * * * is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the * * * determination that it would be in the best interest of [the child] to terminate the rights of [the natural parent]. In making this decision, we must assume the truth of all of the evidence, and of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

*In Re Adoption No. 09598,* 77 Md.App. 511, 518, 551 A.2d 143 (1989). Moreover, in a case involving termination of parental rights, " 'the greatest respect must be accorded the opportunity [the trial court] had to see and hear the witnesses and to observe their appearance and demeanor.' " *Scott v. Dept. of Social Services,* 76 Md.App. 357, 382, 545 A.2d 81 (1988), *quoting, Cecil County Department of Social Services v. Goodyear,* 263 Md. 611, 622, 284 A.2d 426 (1971). Where the best interest of the child is of primary importance, "the trial court's determination is accorded great deference, unless it is arbitrary or clearly wrong." *Scott, supra,* 76 Md.App. at 382–383, 545 A.2d 81.

■ Section 5–313(c) lists an array of factors that a trial court must consider in determining whether termination of parental rights is in the best interest of the child. Specifically, the subsection provides:

(c) *Required considerations.*—In determining whether it is in the best interest of the child to terminate a natural parent's rights * * *, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community;

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

 (i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give any significant weight to any incidental visit, communication, or contribution;

 (ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

 (iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

 (iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of the placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

In a well-reasoned and thorough opinion, the trial court addressed each factor detailed in Section 5–313(c), applied the statutory requirements to the facts, and found by clear and convincing evidence that it was in the best interest of each girl for her mother's parental rights to be terminated. Ms. W. argues, however, that the trial court must have erred in

concluding that the factors supported termination, because the DSS did not, in her view, properly fulfill its role to facilitate a reunion between her children and herself. This argument is without support in the record or in the law.

Ms. W. maintains that she has been willing and ready to reconstruct her life with her daughters but that her efforts to do so have been thwarted by the actions and inactions of the DSS. Specifically, Ms. W. contends that, because she refused to admit that she engaged in sexual acts with her children, the DSS withheld services and would not facilitate a reunion, even though she tried to remain in touch with the children while she was in prison and has attended bimonthly visits with two of the children since being released.

Ms. W.'s argument fails to take into account the trial court's obligation not only to consider the factors set forth in subsection (c) of the statute but also to consider and apply the aggravating factors listed in subsection (d) in cases, such as this one, where there has been a CINA adjudication. The pertinent portion of that statute provides:

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated in need of assistance, * * * the court shall consider the factors in subsection (c) of the section and whether any of the following continuing or serious conditions or acts exist:

* * * * * *

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family; or

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able.

* * * * * *

(3) The court shall consider the evidence under paragraph (1) of this subsection regarding continuing or serious conditions or acts and may waive the child placement agency's obligations under subsection (c) of this section if the court, after appropriate evaluation of efforts made and services rendered, finds by clear and convincing evidence that the waiver of those obligations is in the best interest of the child.

Md.Family Law Code Ann., § 5–313(d).

The trial court considered the evidence that was presented about the factors listed in subsection (c) of the statute that relate to the DSS's obligations—specifically (c)(1), (c)(2), and (c)(6)—and made express findings about that evidence. It evaluated evidence of DSS services that were provided to Ms. W., such as the supervised visitations with Becky and Mindy, and the DSS's offer, refused by Ms. W., of counseling. Likewise, where there was evidence that services had *not* been provided, such as the determination by the DSS *not* to offer services to facilitate a reunion, the court considered that also. Finally, the court made an express finding under subsections (d)(1) and (d)(3) of the statute that there was clear and convincing evidence that waiver of the DSS's obligations under subsections (c)(1), (c)(2), and (c)(6) of the statute was in the best interests of Ms. W.'s daughters.

As noted above, when the DSS intervened in 1986, the family home of Mr. F. and Ms. W. was a house of horrors. The sexual abuse inflicted on Ms. W.'s daughters regularly, over a period of years, is shocking, to say the least. It is a testament to the resiliency of the human spirit that these children have returned to relatively functional and normal lives with the love and assistance of foster families. Ms. W. was in large part responsible for the abusive conditions that her children endured. Ms. W. admitted during her plea that she had been present when her husband had sexual contact with two of the girls. She had direct knowledge of the harm that her husband was doing to the children, yet she repeatedly left them alone with him and did nothing to intervene or to come to their rescue. The trial court, having observed Ms.

W.'s demeanor and having had the best opportunity to assess her credibility, found that her attempts, during the hearing, to deny knowledge of her childrens' plights and to recant her plea were "simply incredible."

The trial court's finding of clear and convincing evidence that Ms. W. committed "serious acts of abuse" against her children by failing to protect them from her husband is well-supported and reasonable; it certainly is not clearly erroneous. Relying on a Pennsylvania case for support, Ms. W. argues, however, that the trial court erred, as a matter of law, in basing its finding of "serious acts of abuse" upon evidence of past, not continuing, abusive acts. Yet, the language of the court in *In Re Involuntary Termination of Parental Rights*, 449 Pa. 543, 297 A.2d 117, 119 (1972), that Ms. W. quotes in her brief makes plain that the Pennsylvania statute at issue in that case required a showing of "continued abuse." In Maryland, the applicable statute does not require any such showing. Indeed, as this Court has observed, subsection 5–313(d) "is satisfied if the court finds the existence of any *one* of the continuing *or* serious conditions or acts ..." *In Re Adoption No. 09598*, 77 Md.App. 511, 526, 551 A.2d 143 (1989) (second emphasis supplied).

As the trial court noted, Ms. W. continues to fail to recognize or even to acknowledge her role in allowing the abuse suffered by her children to persist. She will not take part in counseling; she insists that there is nothing wrong with her and, therefore, she does not need therapy. Instead of accepting help as a means of gaining insight about her role in the tragedy that befell her children, so that, in the future, she will be better equipped to recognize when their well-being is threatened, Ms. W. reacts to all offers of therapy as attempts to humiliate her. Given the severity of the abuse in this case and the absence of any indication that Ms. W. has accepted any responsibility for the abuse or has developed an understanding of what happened sufficient to enable her to look out for her childrens' welfare, the trial court's finding that past acts of serious abuse justified a waiver of the DSS's obligation to provide services will not be disturbed.

Finally, Ms. W. criticizes the trial court for its assessment of the factor set forth in subsection (c)(5)(iv), which pertains to "whether additional services would be likely to bring about a parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement...." The trial court observed that the subsection was not applicable because more than 18 months had elapsed from the time that the children were taken into custody by the DSS and the time of the hearing. Ms. W. argues that this observation was tantamount to a presumption in favor of termination on the basis of the passage of time alone, which is impermissible. *See Wash. Co. Dept. of Soc. Serv. v. Clark*, 296 Md. 190, 461 A.2d 1077 (1983). There is no merit to this argument. First, the trial court did not make a presumption in favor of termination. Rather, it considered all of the statutory factors and found clear and convincing evidence favoring termination. Second, having commented that it considered subsection (c)(5)(iv) inapplicable, the trial court went on to rule, in the alternative, that the evidence presented did not demonstrate that additional services would be likely to allow the children to return to Ms. W. at some time in the future. To the contrary, the trial court found credible evidence, well-supported in the record, that additional services would be *unlikely* to effect a parental adjustment that would enable the children to return, because Ms. W. was unwilling to undergo the counseling necessary to bring about such an adjustment.

Based on the factual findings and the application of Section 5–313, we hold that the trial court did not err in terminating the appellant's parental rights.

### III.

### *SUFFICIENCY OF EXPERT AND OTHER TESTIMONY*

■ During the hearing, Ms. W.'s counsel objected to any expert testimony being offered by Arlene Isaacs, a clinical social worker. The objection was sustained, and Ms. Isaacs was permitted to testify only as a lay witness as to her

observations of the children. Ms. Isaacs served as a transitional therapist. She saw the children in individual and group settings. She testified that it had been her role to assist the children in adjusting to removal from their home of origin to foster care and to help them cope with the abuse that they had suffered at the hands of their parents.

As a lay witness, Ms. Isaacs was competent to testify about the behavior of the children that she heard and saw first hand and the efforts that she undertook to prepare the children for the changes that they were facing. Ms. Isaacs was not permitted by the trial court to express any expert opinion about the adjustments of the children to their foster homes and the testimony that she gave did not enter the province of expert opinion evidence. The trial court did not err in regard to Ms. Isaacs' testimony.

██ Dr. James Miller, a licensed clinical psychologist who had treated Mindy, was qualified by the trial court, without objection, as an expert in the field of psychology. Dr. Miller expressed opinions about Mindy's mental state on the basis of his observations of her and also on the basis of statements that she made to him in the course of therapy. Ms. W. now complains that the court erred in allowing Dr. Miller to express opinions that were based upon the hearsay statements of Mindy.

The court did not err in permitting Dr. Miller to rely upon the statements made to him by Mindy as one of the bases for his expert opinion. An expert's testimony must be grounded in fact, not in speculation or conjecture. This Court has explained the many ways in which an expert may come to know facts that serve as the basis for an opinion:

> The expert's opinion 'has no probative force unless a sufficient basis to support a rational conclusion is shown.' This factual basis may be acquired during trial by the expert's observation of the person on whom he is going to render an opinion. It may be contained within a hypothetical question, or it may be obtained from 'second hand' (often hearsay) information. An expert witness may testify to an

opinion based on facts ordinarily inadmissible as hearsay, but which are facts of the type reasonably relied upon by experts in the field. The expert should relate the information on which the opinion is based so the court can decide if it is reliable and was obtained in a trustworthy manner. The information does not have to be admitted into evidence for the expert to use it in forming an opinion.

*Scott v. Dept. of Social Services,* 76 Md.App. 357, 386–387, 545 A.2d 81 (1988) (citations omitted).

Ms. W. does not contend that Mindy's statements to Dr. Miller in the course of therapy were not the type of factual information that would be reasonably relied upon by a clinical psychologist in forming an expert opinion. Rather, she protests only that the statements were inadmissible hearsay. As the excerpt quoted above makes plain, the hearsay statements of Mindy during therapy were admissible as part of the factual basis for Dr. Miller's opinion testimony.

■ Ms. W. also complains that the DSS did not sustain its burden of proof because it failed to present expert testimony on the issue of Ms. W.'s current mental health and her ability to parent. For the reasons discussed in part II. above, the DSS was not required to present evidence of current, continuing abusive acts by Ms. W. Certainly, Ms. W. could have put on evidence in these areas if she thought it would have been helpful. She chose not to do so.

### IV.

### *TERMINATION OF PARENTAL RIGHTS OVER A CHILD WHO DOES NOT WISH TO BE ADOPTED*

■ At the time of the guardianship hearing, Becky, who was then age 16, testified about the difficulties that she encountered adjusting to life in foster care after the DSS removed the children from their home. Unlike Michelle and Mindy, each of whom have lived with one foster family for a number of years, Becky has had more than one placement.

By 1992, when the hearing was held, she had settled down and was happy with her living situation.

Becky began writing to her mother when Ms. W. was in prison, and has visited with her since her release. She has also maintained contact with her maternal grandfather. Becky testified that she attends supervised visitation with her mother twice a month, for one-half hour at each visit, and that she would like to have the visits increased in length to one hour. Becky told the trial court that she is content living with her current foster mother, but does not wish to be adopted. Becky was ambivalent about whether she wants her mother's parental rights terminated.

Ms. W. complains that, given her somewhat congenial relationship with Becky and Becky's lack of interest in being adopted, there was no "compelling reason" for the trial court to terminate her parental rights over Becky by granting the DSS's petition for guardianship with right to consent to adoption. When the trial court ruled on the DSS's guardianship petition, however, Becky was a minor child who, as explained in graphic detail above, had suffered and witnessed extreme and horrible abuse at the hands of her parents. Becky's status as a CINA and her compelling history of years of abuse and neglect formed a sufficient basis for the trial court's finding, by clear and convincing evidence, that her best interest would be served by the termination of Ms. W.'s parental rights. In considering the issue of termination of parental rights as to Becky, the court took note of her visits with Ms. W. and other maternal relatives. Notwithstanding the evidence of these renewed contacts, there was ample factual support for the trial court's grant of guardianship of Becky to the DSS without Ms. W.'s consent, under the factors enumerated in Section 5–313 of the Family Law Article. Likewise, Becky's stated preference, at the time of the hearing, to remain in the custody of her foster mother without being adopted, does not render erroneous the trial court's termination of Ms. W.'s parental rights.

Under the common law of Maryland, as derived from English common law pursuant to Article 5 of the Declaration of Rights to the State Constitution, the courts did not possess any authority to terminate the rights and obligations of parents to their children or to create new parent-child relationships through decrees of adoption. Only upon enactment of the Maryland Adoption Laws of 1892, Ch. 244, did the courts become empowered to terminate natural parental rights. *McGarvey v. State,* 311 Md. 233, 236, 533 A.2d 690 (1987); *Spencer v. Franks,* 173 Md. 73, 81, 195 A. 306 (1937); *Hillers v. Taylor,* 108 Md. 148, 155–156, 69 A. 715 (1908). Because the judicial authority to terminate parental rights is wholly a creature of statute, the measure of its existence is limited by the ambit of the guardianship and adoption laws set forth in title 5, subtitle 3 of the Family Law Article. *Carroll County v. Edelmann,* 320 Md. 150, 176, 577 A.2d 14 (1990).

As the Court of Appeals observed in *Carroll County v. Edelmann, supra,* Maryland statutory law, including the guardianship statutes codified in Sections 5–313 and 5–317 of the Family Law Article, has expanded the power of the courts to terminate parental rights in certain circumstances where an immediate adoption of the child is *not* contemplated:

> Most States, including Maryland, have since broadened the authority of their equity courts to terminate parental rights in proceedings that do not lead *directly* to an adoption. In most such instances, [* * *] the basis for the termination is that the child has essentially been abandoned, abused, or severely neglected, and the law looks to an eventual adoption, with custody in the meanwhile being vested in a social services or child placement agency or a court-designated relative.

*Id.,* at 175, 577 A.2d 14 (emphasis in original). Indeed, Section 5–319, entitled "Delay in adoption after guardianship granted," expressly anticipates that an adoption may not follow at once the granting of a guardianship and requires that the guardian submit written reports of the child's status to the court and to the natural parents in the interim. Under subsection 5–319(g), when an adoption has not ensued, the

circuit court is authorized to allow the child to remain in long-term foster care with a specified family, if it finds that that is in the child's best interest. Moreover, in 1991, the Legislature amended Section 5–319 to confer continuing jurisdiction upon the circuit court over a child placed under a guardianship with the right to consent to adoption, until the "individual reaches 21 years of age ..." *See* subsection 5–319(i); 1991 *Laws of Maryland*, Vol. III., Chapt. 229, at 1971–1972 (House Bill 879).

A person who is age 10 or older may not be adopted without his or her own consent. Md.Fam.Law Code Ann., § 5–311(a) and (b). Thus, even as early as the time that she was removed from her home of origin, Becky had the right to refuse to be adopted. Because the pertinent statutes do not mandate that adoption follow immediately upon the granting of a guardianship—on the contrary, they make allowances for the court to take certain actions and exercise additional jurisdiction in the event that an adoption does *not* occur—it is not necessary that a child possess a present desire to be adopted for a court to grant a petition for guardianship under Section 5–313. While Becky's feelings about being adopted as expressed by her at the time of the hearing were important, they were not etched in stone; she was, and remains, entitled to change her mind.[1] Becky's stated lack of desire to be adopted did not preclude the trial court from terminating Ms. W.'s parental rights, nor did it make the court's decision to grant the DSS guardianship of Becky with right to consent to adoption improper.

By granting the guardianship, the trial court gave Becky the option to proceed with being adopted, if she were to have a change of heart, without in any way diminishing her right not to be adopted, if her preference continued. Had the court not terminated Ms. W.'s parental rights, despite the strong evidence in favor of doing so, Ms. W. would have retained her

---

1. Becky still has the choice to be adopted or not, even though she has reached the age of majority. Maryland law provides that adults, as well as children, may be adopted. Section 5–307(a); *Ex Parte Libertini*, 244 Md. 542, 224 A.2d 443 (1966); *Hall v. Vallandingham*, 75 Md.App. 187, 190, n. 4, 540 A.2d 1162 (1988).

right as Becky's natural mother to withhold consent to any adoption, under Section 5–311(a); if Becky later decided to go forward with an adoption, she then would be forced to relitigate the issue of termination of Ms. W.'s parental rights. Thus, the trial court's ruling was not only proper, it also gave Becky the widest latitude and freedom in making her choice about adoption.

The trial court's ruling as to Becky also enured to her benefit by eliminating obligations that Becky would have as an adult child to her natural mother. Under Maryland law, an adult child who has or is able to earn sufficient means is legally obligated to support a destitute parent, and is subject to criminal penalties for failing to do so. Md.Family Law Code Ann., § 13–102(a) and (c). *See also Blucher v. Ekstrom,* 68 Md.App. 459, 462–63, 513 A.2d 923 (1986). Now that she has attained the age of majority, Becky's common law and statutory rights of support and maintenance from her natural mother have ended and, absent termination of Ms. W.'s parental rights, her duty to support her mother, under Section 13–102, has arisen. *Compare* Family Law Article Section 5–203(b) to Section 13–102(a). It would be ironic indeed if, after suffering years of abuse and neglect by her mother, Becky would be called upon to provide for her support, or to risk criminal prosecution.

Finally, given the length of time that has elapsed since the ruling of the trial court and Becky's passage from minority to adulthood during that period, we think it important to clarify the current role of the circuit court and the DSS relative to Becky. Section 5–307(b) of the Family Law Article specifies that, "[o]nly a minor may be placed under a guardianship." In addition, Section 5–525, which confers upon the Social Services Administration of the Department of Human Resources the authority to establish a foster care program, speaks in terms of ". . . care for *minor* children." (emphasis supplied). As noted above, when Becky entered foster care and when the trial court placed her in the guardianship of the DSS, she was a minor child. Now, as an unmarried individual who is no longer a minor, but is not yet 21 years old, and who resides in

a foster care home, Becky falls into the precise category of persons that the Legislature sought to protect when it broadened the jurisdiction of the equity courts under Section 5–319(i).[2] Implicit in the expansion of the circuit court's jurisdiction under that statute is the continued legal existence of any guardianship affected by the statute beyond the child's attainment of majority and up to the time of termination of the guardianship by the court, or until the individual's twenty-first birthday, whichever first occurs. Likewise, unless the trial court determines that Becky is no longer in need of foster care services, and that it is in her best interest that the services be terminated, she remains eligible to continue receiving those services that were provided for her when she was a minor, until she reaches the age of 21.[3]

The trial court did not err in terminating Ms. W.'s parental rights over Becky.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**

---

2. In its review of the 1991 Legislative Session, the Department of Legislative Reference noted that there were 72 children age 18 and older in foster care whose parents' rights had been terminated who would be positively affected by passage of House Bill 879. As the jurisdiction of the equity courts over these children had ended when they turned 18, some courts had ordered the DSS to stop providing services to them when they attained majority. House Bill 879 was introduced to permit continued foster care services for children over 18 and under 21, when necessary. Department of Legislative Reference, *1991 Session Review,* at 154.

3. Because the DSS did not file a petition for guardianship of Peggy, we express no opinion as to whether the statutes governing termination of parental rights in the course of guardianship or adoption proceedings allow a person who has attained majority, but who was never placed under a guardianship as a minor child, to petition independently for termination of her mother's natural rights when adoption is not contemplated.