577 A.2d 14

**CARROLL COUNTY DEPARTMENT OF SOCIAL SERVICES,**
Assignee of Bonnie (Reed) (Stem) Clas

v.

**David T. EDELMANN.**

No. 165, Sept. Term, 1989.

Court of Appeals of Maryland.

July 30, 1990.

152

Donna R. Heller, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Charles W. Thompson, Jr., County Atty., Westminster, all on brief, for petitioner.

Samuel J. Brown and M. Evelyn Spurgin, both on brief, Annapolis, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and ALAN M. WILNER, Judge of the Court of Special Appeals of Maryland, Specially Assigned.

ALAN M. WILNER, Judge, Specially Assigned.

The Carroll County Department of Social Services (DSS) appeals two orders of the Circuit Court for Carroll County—one terminating the parental rights and obligations of David Edelmann with respect to his minor child, Pamela Sue Reed, and the other directing DSS to pay a $1,200 fee to an attorney appointed to represent Pamela. Three issues are

presented: (1) is the first order appealable; (2) does a circuit court have the authority, upon petition by one parent and the consent of the other, to terminate the consenting parent's entire legal relationship with a child of the parties other than through an adoption or guardianship proceeding under Md.Code (1984) Family Law art. title 5, subt. 3; and (3) did the court err in directing DSS to pay the $1,200 counsel fee?

We assumed jurisdiction over the appeal before its consideration by the Court of Special Appeals. We shall conclude that the appeal was validly and timely taken, that a circuit court has no authority to terminate a parental relationship other than through a decree of adoption or guardianship, and that the court erred in failing to consider the factors set forth in Fam.Law art. § 12–103(b) before assessing the counsel fee. Regrettably, we are obliged to recount in some detail the long and tortuous history of the case, which, unfortunately, is replete with procedural lapses.

### Background

David Edelmann and Bonnie Clas are the natural parents of Pamela Sue Reed. Pamela was born on November 11, 1981. At the time, David and Bonnie were high school students and unmarried. Pamela has resided continuously with Bonnie; there has been no contact whatever between David and the child.

At some point in 1982, Bonnie applied to DSS for Aid to Families of Dependent Children (AFDC) benefits. As a condition to receiving that aid, she was obliged to assist in establishing the paternity of the child and to assign to DSS her right to child support from the child's father; between 1982 and 1987, she executed several such assignments. In August, 1982, David signed an agreement with the State's Attorney for Carroll County, representing DSS, in which David (1) acknowledged that he was Pamela's father, (2) recognized his duty to support her, (3) agreed to pay child support in the amount of $10 a week during the summer months between school terms and declared his intention,

following graduation from college, to continue to provide support for Pamela "in a reasonable amount taking into account his income and resources, and the financial needs of [Pamela]" but in no event less than $10 a week, and (4) agreed to pay the support to the Bureau of Support Enforcement for Bonnie's account. Based upon this agreement, the Circuit Court for Carroll County, on August 26, 1982, entered an order adjudging David to be Pamela's father and to owe her an obligation of support. The order also incorporated the terms of the agreement.

David apparently paid the $10 a week support in accordance with the agreement, i.e., during the summer months. In April, 1987, following his graduation from college and obtention of full employment, DSS, as Bonnie's assignee, filed a complaint seeking an increase in the child support. It recited the 1982 agreement and alleged that, since then, both David's income and the cost of providing for Pamela had increased. In his answer, David acknowledged the agreement, admitted that his income had increased, and did not deny that the cost of providing for Pamela had also increased. He nonetheless asked that the complaint be dismissed because (1) "he has never seen the minor child since the natural mother refuses any visitation," (2) it was his understanding "that the natural mother will be filing for a termination of parental rights in which he will consent," and (3) "[i]t appears that the natural mother does not believe that the Defendant should have anything to do with the minor child."

A month later, Bonnie filed a petition to terminate David's parental rights. She alleged, in pertinent part, that David "has not exercised visitation with [Pamela] for over five (5) years," that his consent to the termination of his parental rights was attached, and that she believed such termination was in the best interests of the child. Attached to the petition was a consent signed by David "to the termination of my parental rights to [Pamela] and ... to the passing of an Order by this Honorable Court terminating my parental rights to the child." In response to that

petition, David's lawyer, Samuel Brown, Esq., entered his appearance and contended that David "had consented to the [termination] of parental rights" and that "[i]t is further the understanding of the natural father that his obligations for support of this child shall terminate immediately."

The first procedural lapse appears at this point. The DSS complaint was captioned "Carroll County Dept. of Social Services, Assignee of: Bonnie Clas, Plaintiff vs. David Theodore Edelmann, Defendant"; it was placed on the "paternity" docket and given the case number 209. Bonnie was not a party to that action. Her petition was apparently intended as a separate action. It was captioned "IN THE MATTER OF THE PETITION OF BONNIE CLAS FOR TERMINATION OF PARENTAL RIGHTS" and contained no case number or other docket reference. For whatever reason, however, the clerk filed and docketed the petition and David's response to it in the DSS paternity action. That served to sow the next bit of confusion as DSS, on the one hand, filed a motion to intervene "in the case of In the Matter of the Petition of Bonnie Clas for Termination of Parental Rights," but, on the other, treated Bonnie's petition as though it were part of the paternity action by using the "209" case number.

DSS asserted in its motion that it was the assignee of Bonnie's right to child support, that Bonnie had been receiving AFDC for the benefit of the child, that DSS had been attempting to obtain an agreement as to child support from David, that Bonnie's petition would have the effect of extinguishing its right to act upon the assignment from Bonnie, that it "is a blatant attempt to circumvent the efforts of [DSS] to collect child support from [David] who has an obligation to support his natural child," and that it is against public policy and not in the best interest of the child or the State. Over David's and Bonnie's objection, the court granted DSS's motion and designated it as a plaintiff "in this matter."

The initial complaint for increased child support was then shunted aside and, on September 4, 1987, the court held an

evidentiary hearing on Bonnie's petition to terminate David's parental rights. Bonnie stated that she wanted to terminate those rights "[b]ecause he's never seen [Pamela] and I feel that she'll be all confused and upset if you bring somebody into her life that she's never seen." Bonnie's father also expressed the view that "[a]s things exist the way they are right now" termination of David's rights would be in Pamela's best interest. He acknowledged, however, that, if David "stepped back in and he came to visit to get to know the child ... she would get to know him as her father. But, right now, she would be totally confused...."

Although Bonnie opined that Pamela then had a stable environment, she admitted to a most unstable series of relationships since Pamela's birth. At the time of the hearing, Bonnie was 22 years old. After the break-up of her association with David, she married one Timothy Stem, with whom she had one child. After her divorce from Stem, she married a Mr. Hurtle. It is not clear how long she remained married to Mr. Hurtle, but at some point she married David Clas, whom she was then in the process of divorcing. Her current companion, with whom she had been living for a year and by whom she had a third child, was Doug Lowe. Doug, she said, would like to adopt Pamela, who "calls him Daddy."

David also testified. When asked why he wanted his parental rights terminated, he replied:

"When I was given the opportunity to see Pamela, I tried to pursue, and for three instances, I was—the meetings were put off 'til a later date. And, all along, [Bonnie] expressed that she has a stable family environment and that I would only be confusing the child by stepping in at this time. She—I—I was under the impression that she had someone that she recognized as her father and that her grandfather provided a lot of love and care for her as well."

The circumstances of these three attempts to see Pamela were explored further. In mid-January, 1987, shortly after

David's graduation, Bonnie called him. The purpose of the call is not revealed in the record, but promptly after the call, David obtained a lawyer in order to "facilitate exercising visitation rights." It does not appear that Bonnie actually objected to visitation. When asked whether it was her desire at the time for David to enter Pamela's life "as the father of the child," she replied:

> "I wanted him to enter into her life as a friend of mine, until I seen it was gonna hit it off. I wanted her to get to know him first and, then, later on, I would've told her who he was, once she got to know him and all."

Visitation did not occur, she said, "[b]ecause he never showed up." When asked whether she had given David an opportunity to visit, she stated, "Yes, I did. He's had opportunity for the last six years to come." David described three scheduled meetings with Pamela:

> "We had set up a meeting with Pam. The first meeting appeared to be canceled because I had acquired counsel and it was just pushed off. I later spoke with [Bonnie] and set up another meeting and the night before that meeting, I was told that her mother was sick and going in the hospital, that we couldn't meet.
>
> A third meeting was set up I believe it was Easter weekend. I was informed late Thursday night that I could see the child on Saturday. And the problem with that was the fact that I had plans to be out-of-town with … my bride's family."

Other evidence suggested that David's sudden desire to see Pamela, after more than five years of absence, arose in response to an awareness that DSS would soon be seeking an increase in child support. As early as February, 1987, his attorney, Mr. Brown, had been discussing the matter of support with the State's Attorney. In a letter of February 27 to Bonnie's lawyer, he raised the prospect of avoiding any injection of David into Pamela's life by having his parental rights terminated. He began his letter by urging that:

"Mr. Edelmann is sincere about his desire to establish a relationship with his daughter. Both parties are still young and it does not seem fair that the daughter should suffer by never knowing her father. I believe that Mr. Edelmann can provide his daughter with another important aspect of life and to be a good, stabilizing, positive influence on her."

He posited that "it is in the child's best interest to eventually meet [her] father and to establish a relationship" and warned that, if Bonnie did not feel the same way, David could file a petition for visitation. Mr. Brown also acknowledged his ongoing discussions with the State's Attorney looking toward a new support agreement and explained that "if visitation is denied *and parental rights terminated,* we will not be agreeing on any support obligations since it would be foolish for us to pay additional monies now without any rights at all relating to the child." (Emphasis added.)

The prospect of a termination of David's parental rights, so casually mentioned in this letter, became more explicit in a letter Mr. Brown sent the same day to Thomas Russell, the Assistant State's Attorney handling the support matter. Enclosing a copy of his letter to Bonnie's lawyer, Mr. Brown informed Mr. Russell that:

"There is a possibility that they [Bonnie and her lawyer] will be moving for a termination of parental rights. With that in mind, it would be foolish to go forward on a Support Petition for additional funds. If Mr. Edelmann is not going to have the right to visit with his daughter and have his rights terminated, it seems foolish on the part of anyone to waste the Court's time getting an increase in support or coming to some agreement."

Upon all of this evidence, the court found that David and Bonnie were sincere and knew what they wanted insofar as Pamela was concerned. It also declared that "considering the present situation of [Bonnie], it would appear to us that the best interest of this child will be taken care of in the future. So, the Petition to Terminate is granted." That

decision was recorded in the docket entry for September 4. After reciting that the case was called, the entry states: "Hearing had and testimony taken on Plaintiff's Petition to Terminate Father's Parental Rights. Order (short) of Court granting Petition and terminating Parental Rights."

Regarding the oral order, confirmed by the docket entry, as the final judgment in the matter, DSS noted an appeal on September 10, 1987. On September 15, however, the court signed and filed a written order granting the petition for termination of David's parental rights and retaining continuing jurisdiction over the child. As with the oral ruling and docket entry of September 4, however, nothing was said in this order about the initial complaint by DSS to increase child support.

The filing of this order engendered three motions by DSS—two on September 18 and one on October 2. The first was a motion to revise "the Judgment entered in the above referenced case on September 4, 1987, and the Order entered September 15, 1987...." DSS contended first, that, as Pamela's right to support from her father was at issue, she was entitled to counsel and second, that under Fam.Law art. §§ 5–312 and 5–313, which are part of the State adoption law, the court, in determining whether it was in the child's best interest to terminate parental rights, was required to consider a number of facts that could be ascertained only after a study had been conducted by an appropriate agency. DSS therefore asked that the court reopen the proceeding to appoint counsel for Pamela and an appropriate agency to conduct an investigation into the factors required by §§ 5–312 and 5–313.

The second motion, also filed in the circuit court, asked the court "to Withdraw the Order of Appeal because we have filed a Motion for Reconsideration which is pending." The third motion was a duplicate of the second, but it was filed in the Court of Special Appeals on October 2, 1987.

Without the benefit of a hearing, the circuit court acted on the two motions before it on September 24. It first

signed an order stating in pertinent part that "the Motion to Withdraw Order of Appeal filed in the above case be, and is hereby WITHDRAWN...." [1] It then signed an order rescinding the decision of September 4 and the order of September 15, directing DSS to conduct an investigation to determine whether it was in Pamela's best interest to terminate David's parental rights, appointing Ralph Uebersax, Esq. as attorney "to represent the interests of the child in these proceedings," and directing the clerk to set the matter for trial on the issue of the termination of David's parental rights promptly upon receipt of the DSS report.

On September 30—six days after the orders were signed but within 15 days after DSS's motions were filed—David filed a response to the motion to revise, urging that the court lacked jurisdiction to consider that motion because of the pendency of the appeal. He also complained that DSS's "continued intervention in this action acts as an invasion of constitutionally protected privacy rights" of both Bonnie and David. On October 5, after learning of the court's orders of September 24, he followed up with a motion to revise those orders, complaining that they had been entered without the benefit of a response.[2] On October 6, presum-

---

**1.** We assume that the word "WITHDRAWN" constituted an inadvertent error. The order appears to have been prepared by the Assistant State's Attorney and appended to the motion. The motion, as indicated, asked that the *Order of Appeal* be withdrawn, not the motion itself. Presumably, DSS intended that the motion be "GRANTED," not "WITHDRAWN." It is evident from the granting of the motion to revise that the court had the same intention.

**2.** DSS's motion to revise was stated to be under Md. Rule 2–535 rather than under Rule 2–534. Presumably, this reflected its view that a judgment was entered on September 4 rather than on September 15. Under Md. Rule 2–311, David had 15 days in which to file an answer. Rule 2–311(b) states that "[i]f a party fails to file a response required by this section, the court may proceed to rule on the motion." Necessarily implicit in that is the direction that the court *not* rule on the motion before the time allowed for a response has elapsed. Otherwise, there would be no point in allowing time for a response. Even if DSS's motion to revise were regarded as being subject to Rule 2–534, section (e) of Rule 2–311 makes clear that the court may not grant such a motion without a hearing.

ably unaware of the post-judgment proceedings in the circuit court, the Court of Special Appeals summarily "endorsed and treated [the motion before it] as a line dismissing the appeal"; a mandate was issued the next day. On October 20, without assigning any reasons, the circuit court entered an order striking from its September 24 order the direction that DSS conduct an investigation. Although David had requested a hearing on his motion to revise, it does not appear that any hearing was held prior to the order of October 20.

Nothing more of significance happened until early February, 1988, when DSS (1) filed, or refiled, a complaint to increase David's child support and (2) alleging that David had paid no child support since September 1, 1987 and was $200 in arrears, requested service of an earnings lien order. On February 9, the court entered such an order and further directed that David appear on March 29 for a hearing on DSS's complaint for increase in child support. That produced a motion by David to reinstate the order of September 15, 1987, terminating his parental rights. He averred that he had heard nothing from Mr. Uebersax who, as noted, had been appointed as counsel for Pamela. DSS responded that it was unaware of the October 20 order rescinding the DSS investigation and objected to it.[3] It urged that a full inquiry be conducted prior to the termination of any parental rights and that no action be taken without a full and fair hearing.

---

**3.** Throughout the initial phase of these proceedings, DSS was represented by Kathi Hill, an Assistant State's Attorney for Carroll County. On September 18, 1987, Charles Thompson, the county attorney for Carroll County, entered his appearance "as additional counsel" for DSS. Both thereafter participated in the case, sometimes separately, sometimes jointly. Ms. Hill had filed the two motions to withdraw the appeal and she also filed the new complaint for increase in child support and the request for earnings lien; Mr. Thompson and Ms. Hill jointly filed the initial motion to revise; Mr. Thompson alone filed the answer to David's motion to revise. The order of October 20 shows tht a copy of it was sent to Ms. Hill. If Mr. Thompson was unaware of that order, as he alleged, it was because of a communications problem between him and Ms. Hill.

On March 7, 1988, Mr. Uebersax also filed an answer to David's latest motion. He averred that he had not received a copy of any order other than that of September 24, 1987, appointing him as counsel for Pamela and directing a DSS investigation, and that he had been "patiently awaiting the report of the investigation" and the assignment of a trial date. He too asked that a full and fair hearing be had on all issues "so that all positions, including [Pamela's], might be properly placed before the Court for determination."

Except for a good bit of squabbling over the complaint for increased child support and the request for earnings lien, nothing more transpired until March 15, 1989, when the court conducted a hearing on the various pending motions pertaining both to the termination of parental rights and to the child support issues. No evidence was taken, and indeed, when Mr. Uebersax began to comment with respect to the child, David's lawyer successfully objected that that issue was not before the court. The court held the matter *sub curia* until August 24, 1989, when, in a terse order giving no reasons, it reinstated its order of September 15, 1987. DSS filed an appeal from that order.

Mr. Uebersax then filed a petition for counsel fees, contending that, following his appointment, he "has reviewed the entire voluminous file, has met and interviewed his client, has participated in a hearing before the Circuit Court for Carroll County, has prepared for said hearing, has had discussions with counsel for the various parties in this matter, has corresponded with the various counsel of the parties in this matter, and has represented his client's interests to the various parties in this matter." On October 19, 1989, without a hearing and without assigning any reasons, the court granted the motion and ordered DSS to pay Mr. Uebersax a fee of $1,200. DSS appealed from that order as well.

### Appealability

No question has been raised with respect to the timeliness of DSS's appeal from the counsel fee order. That

appeal clearly was noted within 30 days after entry of the order.

The main appeal is from the order of August 24, 1989, reinstating the order of September 15, 1987. That appeal was filed within 30 days after entry of the August, 1989 order and so, facially, was also timely. Because of the cavalier way in which the case proceeded, however, two issues of appealability need to be addressed.

The first of these, which we note on our own initiative, arises from the apparent inclusion of Bonnie's petition to terminate David's parental rights as part of the DSS action to increase his support obligations. As we indicated, although Bonnie was not a party to the initial action, the clerk placed her petition in the existing file and, from and after DSS's motion to intervene in that case, all papers, whether bearing on the issue of support or termination, carried the same case number, 209. If, under that circumstance, the petition to terminate David's parental rights became a claim in the DSS action, a question under Md.Rule 2–602 would arise, as no order or docket entry yet appears that formally disposes of DSS's petition to increase David's child support. The court regarded its ultimate order terminating David's parental obligations as making all pending motions addressed to DSS's complaints moot, at least after the effective date of the termination, but no judgment dismissing or otherwise disposing of those complaints has been entered.

■ We hold, however, that the clerk in effect misfiled Bonnie's petition and the ensuing papers engendered by it in the DSS case and that such misfiling does not make that petition part of that case. Bonnie, as we said, was a stranger to that case. Absent an order allowing her to intervene in it, she had no right to file a pleading in the case or to inject a new claim into it and, from the caption on her petition, apparently did not *intend* it to be filed in that case. The clerk should have treated her petition as a new and separate action which, under Md. Rule 2–503, could then have been consolidated with the DSS action. It would be

inappropriate under these circumstances to permit a purely clerical error to assume jurisdictional significance, and so we shall regard the termination proceeding as though it were, in fact, a separate action consolidated with the complaint for increased child support. The order disposing of that action, therefore, does not lose its quality as a judgment because a formal ruling is lacking on the DSS complaint. *See Yarema v. Exxon Corp.*, 305 Md. 219, 234–40, 503 A.2d 239, 246–49 (1986); *Planning Board v. Mortimer*, 310 Md. 639, 642 n. 1, 530 A.2d 1237, 1238 n. 1 (1987).

The second question as to appealability, mentioned by David, arises from the events occurring between September 4 and October 7, 1987.

As we indicated, the evidentiary hearing on Bonnie's petition to terminate David's parental rights occurred on September 4, at the conclusion of which the court announced that the petition was granted. The docket entry for that day confirmed that decision. Nothing was said, either by the court or the clerk, suggesting that any further order was anticipated. It is evident, then, that a final judgment—a final, conclusive, unqualified, and complete disposition of the matter—was entered on September 4. *See Rohrbeck v. Rohrbeck*, 318 Md. 28, 566 A.2d 767 (1989). DSS, as noted, took an appeal from that judgment on September 10. When the court filed its order of September 15, however, it put into question both the validity of the September 4 ruling as a judgment and the effectiveness of the September 10 notice of appeal.

At that point, it appears that DSS made a conscious decision to proceed further in the circuit court through a motion to revise rather than in the appellate court. On September 18, it filed in the circuit court a motion to withdraw the previously entered appeal and a motion to revise. For whatever reason, the duplicate motion to withdraw the appeal was not filed in the Court of Special Appeals until October 2. The circuit court granted the motion before it on September 24, the same day that it entered another order rescinding the ruling of September 4

·and the order of September 15. On October 6, the Court of Special Appeals treated the motion before it as a "line" of dismissal, and on October 7, it issued a mandate. The question, alluded to by David at oral argument, though not mentioned in his brief, is whether, because of the September 10 appeal, the circuit court had any jurisdiction to enter the September 24 order of rescission. David contended ·that, until the Court of Special Appeals mandate of October 7, the court was without power to act on the judgment. Under that theory, DSS would be caught in this dilemma: the·September 24 order of rescission would be·a nullity, thus. leaving the September 4 judgment intact, but, as the appeal from that judgment was effectively dismissed on October 7, the right to appeal from it, and thus to obtain appellate·review of the termination of David's parental rights, has been lost.

■ We need not, in this case, revisit the question of what action a circuit court can properly take while an appeal is pending. For one thing, even if the court acted inappropriately under the principles of *Tiller v. Elfenbein*, 205 Md. 14, 106 A.2d 42 (1954), its orders would not be a nullity but would simply be subject to reversal on appeal. *See Pulley v. State*, 287 Md. 406, 412 A.2d 1244 (1980); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford*, 307 Md. 1, 511 A.2d 1079 (1986); *Makovi v. Sherwin–Williams Co.*, 311 Md. 278, 533 A.2d 1303 (1987); *State v. Peterson*, 315 Md. 73, 553 A.2d 672 (1989). Moreover, because we conclude that the appeal from the September 4 judgment had effectively been dismissed before the September 24 order of rescission was entered, we find no procedural impediment to the entry of that order.

■ Unlike many States, Maryland has long permitted an appellant to dismiss his appeal voluntarily. without leave of court. *See Diffenderffer v. Hughes*, 7 H. & J. 3, 4 (1825); *Newson v. Douglass*, 7 H. & J. 417, 454 (1826); *Hagerstown Repro. Health Serv. v. Fritz*, 294 Md. 347, 349, 450 A.2d 906, 907.(1982) (Eldridge, J., dissenting). Until July 1, 1988,

however, there was no formally prescribed procedure for accomplishing that result. The only formal Rules relating to the dismissal of appeals dealt with *involuntary* dismissals, either on the court's own initiative or upon the impetus of an appellee, and, understandably, they required at least an order, and, in the latter instance, a motion as well. *See* former Md. Rules 835 and 1035. Perhaps because they were the only Rules dealing with dismissals, it was not uncommon for appellants desiring to dismiss their appeals to file a motion to do so. As was the case here, however, the practice, at least in the Court of Special Appeals, was to treat such a motion as a "line" of dismissal and docket it as such. See J. Romano, *Clerk's Office of the Court of Special Appeals of Maryland,* in 2 *The Maryland Appellate Practice Handbook* F–9 (1977): "Any appellant wishing to dismiss his appeal may do so by simply filing a 'Line' directing the Clerk of this Court to do so, with a copy thereof to all counsel of record. A formal motion is unnecessary."

Current Md. Rule 8–601 confirms the ability of an appellant to dismiss his appeal without leave of court but, for the first time, specifies how that is to be done—by filing a notice of dismissal *in the appellate court* and, if the record is still in the lower court, by filing a copy of the notice in that court. But, as noted, that Rule was not in effect in September, 1987, and so, notwithstanding Mr. Romano's sage advice, there was no express requirement then that the notice be filed in the appellate court. Presumably, the motion was filed in the circuit court because the record was still there and because that is where DSS filed the notice of appeal. In any event, it is evident that DSS intended to dismiss its appeal on September 18 and that it took an affirmative step that day to do so. There was no question at that point of any actual or potential conflict between the trial and appellate courts; DSS and the judge understood that DSS was thenceforth seeking relief solely in the circuit court. We therefore believe that the appeal was effectively dismissed on or before September 24, and

that the court was not precluded by the appeal from hearing and deciding the motion to revise. *See Tiller v. Elfenbein, supra,* 205 Md. at 21, 106 A.2d 42.[4] It follows, then, for both reasons, that there was no jurisdictional defect in the ensuing proceedings and that the ultimate appeal from the August 24, 1989 order properly presents the substantive issue raised by DSS.

## DSS Intervention

■ In its motion to intervene, DSS asserted an interest in Bonnie's petition to terminate David's parental rights on two bases: first, that it affected DSS's rights as Bonnie's assignee to collect child support from David and, second, that the petition was against public policy, contrary to the rights of the child, and not in the best interest of either Pamela or the State. Although both David and Bonnie initially objected to the intervention and David continued to grumble about it from time to time, neither party has raised it as an issue in this appeal. Because the matter is of such obvious and central importance, however, we think it appropriate to make clear our view that the intervention was proper.

As Pamela's father, David had a duty to support the child during his life and her minority. Bonnie had been receiving AFDC and other welfare benefits for most of Pamela's life and was receiving them even on the date of the evidentiary hearing in September, 1987. Under applicable law and the various assignments, DSS had a continuing right to enforce David's support obligation in order to recover at least part of the funds it was obliged to pay for Pamela's sustenance. Unlike an adoption, where another person is available to support the child, the effect of a termination here would simply be to end David's duty of support without any

---

**4.** As we indicated, the court should not have considered the DSS motion until the time for an answer to it had lapsed, but, as neither David nor Bonnie has raised that as an issue in this appeal, we shall take no further cognizance of the error.

legally obligated substitute. That would have left DSS with a continuing obligation to pay benefits but no ability to recover from the person legally and contractually bound. Quite apart from any eligibility for permissive intervention under Md. Rule 2–214(b), we think that DSS had a right of intervention under Rule 2–214(a). It claimed an interest in the transaction that was the subject of the action and was so situated, given the alignment of David and Bonnie, that disposition of the action would, as a practical matter, impair or impede its ability to protect that interest.

### Authority of Circuit Court

DSS contends that Maryland law imposes on a parent a clear and firm obligation to support his or her minor children and that that obligation cannot be bargained away by the parents or terminated by court action other than through a judgment of adoption or guardianship entered pursuant to Fam.Law art. title 5, subt. 3. It urges indeed that a circuit court has no "jurisdiction" to terminate that obligation otherwise. David purports to find such "jurisdiction" either under some general inherent power of an equity court or under Fam.Law art. § 1–201(a).

As this Court has taken pains to point out in a number of recent cases, the term "jurisdiction" encompasses a number of different meanings. As applied to courts, it refers to "the power to act with regard to a subject matter which 'is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred.'" *Pulley v. State, supra,* 287 Md. 406, 416, 412 A.2d 1244, 1249 (quoting *Cooper v. Reynolds' Lessee,* 77 U.S. (10 Wall.) 308, 316, 19 L.Ed. 931, 932 (1870)). We continued in *Pulley* that "[i]f by that law which defines the authority of the court, a judicial body is given the *power* to render a judgment over that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter jurisdiction." *Id.* [287 Md.] at 416, 412 A.2d 1244 (quoting *First Federated Com. Tr. v. Comm'r,* 272 Md. 329, 335, 322

A.2d 539, 543 (1974)) (emphasis in *First Federated*). *See also Block v. State*, 286 Md. 266, 407 A.2d 320 (1979); *Parks v. State*, 287 Md. 11, 410 A.2d 597 (1980).

To some extent, of course, application of this principle depends on how one defines the generic "class of cases." Here, the class is defined by the authority to terminate parental rights and obligations. There is no doubt, and indeed DSS necessarily concedes, that equity courts do have the power—the fundamental jurisdiction—to terminate those rights and obligations. An order of an equity court doing so is therefore not void for want of subject matter jurisdiction. The question rather is under what circumstances the court may appropriately exercise that jurisdiction; is it authorized, by some provision of law or by some inherent authority, to exercise it in this kind of case? That is the issue we need to examine.

 Parenthood is both a biological and a legal status. By nature and by law, it confers rights and imposes duties. One of the most basic of these is the obligation of the parent to support the child until the law determines that he is able to care for himself. As it is the obligation of the parent to provide that support, so it is the right of the child to expect it. Blackstone said it eloquently:

"The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation, says [Baron Samuel von] Puffendorf [ (1632–94) ], laid on them not only by nature herself, but by their own proper act, in bringing them into the world: for they would be in the highest manner injurious to their issue, if they only gave their children life that they might afterwards see them perish. By begetting them, therefore, they have entered into a voluntary obligation to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children have the perfect *right* of receiving maintenance from their parents."

1 W. Blackstone, *Commentaries* *447 (emphasis in original).

Maryland law, less eloquent but more succinct, states the same principle. Fam.Law art. § 5–203 makes the parents the natural guardians of their minor child and "jointly and severally responsible for the child's support, care, nurture, welfare, and education...." Section 10–203 declares it a misdemeanor for a parent to "willfully fail to provide for the support of his or her minor child" or to "desert his or her minor child."

It is a fact of history, of course, that parents have not always been able or willing to fulfill this fundamental obligation. In some societies, the law (or custom) permitted infanticide, the selling of children by their fathers, and the expulsion of rebellious or disobedient children. Fortunately, these mechanisms have never been been part of our established jurisprudence. A more humane approach, which we find even among the ancient Babylonians, Egyptians, and Greeks was that of adoption, whereby children born to one family were formally given to and raised and supported by another. *See generally* Presser, *The Historical Background of the American Law of Adoption*, 11 Jour. of Family Law 443 (1971); Brosnan, *The Law of Adoption*, 22 Colum.L.Rev. 332 (1922); Huard, *The Law of Adoption: Ancient and Modern*, 9 Vand.L.Rev. 743 (1956). The Code of Hammurabi (circa 2250 B.C.) provided for and regulated adoptions. *See* C. Johns, *Babylonian and Assyrian Laws, Contracts and Letters* 61, 154–60 (1904 Reprint ed. 1987); H. Maine, *Ancient Law* 22 (1861 Dorset Press ed. 1986). Roman law did likewise. *See Institutes of Justinian*, Bk. 1, Title XI; Watts, Cicero, The Speeches, *De Domo Sua*, xiii, xiv, at 175–81 (Loeb ed. 1923).

The legal concept of adoption, as set forth in Roman law, was picked up in many of the civil law societies whose legal structure emanated from the Roman. But, save for some isolated instances, it never found its way into the common

law.[5] See *Hillers v. Taylor*, 108 Md. 148, 155–56, 69 A. 715, 718 (1908):

> "The adoption of children, although a practice of great antiquity recognized by the civil law throughout its entire history and observed in countries whose jurisprudence is founded on that law, was unknown to the common law and exists in States, which have inherited that system of jurisprudence, only by virtue of statute."

*See also Spencer v. Franks*, 173 Md. 73, 195 A. 306 (1937); *Atkins v. Gose*, 189 Md. 542, 56 A.2d 697 (1948). Indeed, writing prior to the 1926 enactment of a statute by Parliament specifically authorizing adoptions, one "learned English authority" observed:

> "The law of England knows nothing of adoption. Its theory is that the father, as legal guardian—and the same principle applies to the mother—cannot abdicate by any contract the position of parental responsibility, or rid himself irrevocably of the sacred duties of fatherhood. He may purport to do so, but the law will not recognize any such promise as binding; it allows him to retract and repudiate it at any time."

Edward Manson, Esq., of the Middle Temple, London, *quoted in* Brosnan, *supra*, 22 Colum.L.Rev. at 335.

---

5. Mr. Presser, in his article, *The Historical Background of the American Law of Adoption, supra*, 11 Jour. Fam. Law at 448, notes that "[t]he usual explanation for the absence of a legal recognition of adoption in the English common law is the inordinately high regard for blood lineage of the English." Another author observed:

> "From the feudal era to the twentieth century, the English legal system was unable to accommodate the status of adoption without seriously disturbing other branches of law. A system of adoption posed numerous difficulties for the medieval and early modern English: it threatened the security of title to land, which traced ownership through ancestry; it violated practically every rule of inheritance; and it denied the Christian canons of marriage and legitimacy."

Zainaldin, *The Emergence of a Modern American Family Law: Child Custody, Adoption, and the Courts, 1769–1851*, 73 Nw.U.L.Rev. 1038, 1045 (1979).

Mr. Manson's pronouncement finds clear support in *Humphrys v. Polak*, [1901] 2 K.B. 385 (C.A.). Pursuant to contract, the mother of an illegitimate child[6] placed the child with the defendants, for them to raise and maintain her "as though she were the defendants' own child, and for ever to relieve the plaintiff from all liability and responsibility in connection with the bringing up of the said child...." *Id.* at 385. After about four months, the defendants refused to maintain the child any longer, whereupon the mother sued for breach of the contract. Affirming an order striking out the claim, the court held that the mother could not divest herself of her responsibilities toward the child. Under the contract, said Lord Justice Stirling, "the defendants were to undertake the duties which the law imposes on the mother, and to have the rights which the law gives her in relation to the child. In my opinion, the law does not permit such a transfer of the mother's rights and liabilities." *Id.* at 390. See also *Waterhouse v. Waterhouse*, 94 L.T. 133, 22 T.L.R. 195, 50 Sol. J. 169 (1905), where Justice Buckley, denying an injunction to restrain an adult child from entering his father's house, said, in pertinent part:

> "[T]he duty arising from the relation of parent and child, whether directly enforceable or not, is a duty of which the parent can in no circumstances divest himself. The duty is not limited to providing maintenance during infancy or any other time. It is a duty so to conduct himself in all respects towards his child as is right in him, he being his father."

This was also true in the United States. It was not an uncommon practice in the 17th and 18th centuries for impecunious parents to bind or "apprentice" children to service for other families, and a few cases exist in which a

---

**6.** Although the pejorative "illegitimate" has long and often been applied to a child born to parents who were not married to one another, there is really nothing illegitimate about the child. The problem is that the parents failed to conform to established social norms. Demeaning the child because of the "sins" of the parents seems to us to be most unfair.

court precluded a parent from regaining physical custody of a child who had been "apprenticed" to another family and who was being well-treated.[7] Jurisdiction to appoint and supervise guardians for orphans and abandoned children also clearly existed, but it does not appear that there was any legal authority under the common law in this State for a total relinquishment of parental rights and obligations or any inherent authority in any court to terminate them.

The first clear authorization for the legal termination of the entire parental relationship came with the adoption statutes, the earliest of which, in Maryland, appeared in the first half of the 19th Century in the form of private bills.[8] General adoption statutes authorizing courts to enter decrees of adoption did not appear until the mid–19th Century—Mississippi in 1846, Massachusetts in 1851. Maryland's initial general adoption statute was enacted in 1892. *See* 1892 Md. Laws, ch. 244.

---

**7.** See Zainaldin, *supra,* 73 Nw.U.L.Rev. 1038, 1075–84, reviewing some of the cases in this area. The practice and procedures for apprenticing children in early colonial Maryland are described in Carr, *The Development of the Maryland Orphans' Court, 1654–1715,* in A. Land, L. Carr, & E. Papenfuse, *Law, Society, and Politics in Early Maryland* 41 (1974). For a more general survey, see Presser, *supra,* 11 Jour. of Fam. Law, 470–89.

**8.** See, for example, 1847 Md. Laws, ch. 29, changing the name of Catharine Maker to Catharine Coudy and authorizing James and Mahala Coudy "to adopt the said Catharine Maker as their daughter and legal heir at law." 1824 Md. Laws, ch. 150 changed the name of Louisa Decoutres to Louisa Jacob on the joint petition of George Jacob and Ms. Decoutres and noted, in a "Whereas" clause that Mr. Jacob "wishes to adopt the said Louisa as his daughter." It is not clear that this 1824 Act actually accomplished an adoption as we conceive the term. See also 1820 Md. Laws, ch. 155, wherein the General Assembly granted the petition of George Townes to change his name to George Thompson "to enable him to become the adopted child and heir at law of Thomas Thompson...." Although the Session Laws prior to 1864 abound with private bills changing people's names, bills actually purporting to authorize an adoption were very rare. The authority of the General Assembly to enact bills changing names was removed in the 1867 Constitution; in 1868, the Legislature conferred that authority on the circuit courts. 1868 Md. Laws, ch. 311.

Most States, including Maryland, have since broadened the authority of their equity courts to terminate parental rights in proceedings that do not lead *directly* to an adoption. In most such instances, however, the basis for the termination is that the child has essentially been abandoned, abused, or severely neglected, and the law looks to an eventual adoption, with custody in the meanwhile being vested in a social services or child placement agency or a court-designated relative. Some of the statutes enacted in other States appear to permit a termination order to be based solely or principally on a voluntary relinquishment of parental rights by the affected parent.[9]

Maryland has not gone that far. The only express statutory authorization for a court to terminate parental rights and obligations short of adoption is contained in Fam.Law art. §§ 5–313 and 5–317, which permit a circuit court to terminate those rights and obligations through a decree of guardianship. But such a decree may be entered only upon petition of a child placement agency or an attorney for the child. Moreover, the statute looks to the termination of the rights of *both* natural parents and the granting of custody of the child to a child placement agency for adoption. It clearly does not permit the kind of order entered in this case.

The only other source of authority cited to us by David is § 1–201(a) of the Family Law article. That section vests in an equity court jurisdiction over adoption of a child, alimo-

---

9. *See, for example,* Colo. Rev. Stat. §§ 19–5–101 to –107; Del.Code Ann. title 13, §§ 1103–1106; Idaho Code §§ 16–2001 to –2010; Ind. Code Ann. § 31–6–5–2 (Burns 1987 & Supp.1990); Iowa Code Ann. §§ 600A.2–.9; Ky.Rev.Stat.Ann. §§ 625.040–045; Minn.Stat. § 260.221; S.D.Codified Laws Ann. §§ 25–5A–2 to –21; Tex.Fam.Code Ann. § 15.01; Utah Code Ann. § 78–3a–48; W.Va.Code § 49–6–7; Wis.Stat.Ann. § 48.41. A number of the statutes of this type appear to require more than just the parent's consent. Some require, for example, that the petition be filed by a social service or juvenile service agency. The Texas law, on the other hand, provides simply that: "A parent may file a petition requesting termination of the parent-child relationship with his child. The petition may be granted if the court finds that termination is in the best interest of the child."

ny, annulment of a marriage, divorce, custody or guardian-
ship of a child, visitation of a child, legitimation of a child,
paternity, and support of a child. Nothing in that statute,
however, purports to authorize the court to terminate a
parental relationship other than through a decree of adop-
tion or guardianship.

For these reasons, we conclude that the circuit court
erred in entering the judgment of September 4, 1987, the
order of September 15, 1987, and the order of August 24,
1989. Absent specific statutory authorization which does
not now exist in this State, a circuit court has no authority
to terminate a parental relationship other than through a
decree of adoption or guardianship under title 5, subtitle 3
of the Family Law article. The case will therefore be
remanded for an order dismissing Bonnie's petition. This
will, of course, require the court to conduct further proceed-
ings on DSS's complaint for an increase in child support.

### Counsel Fees

Family Law art. § 1–202 provides that:

"In an action in which custody, visitation rights, or the
amount of support of a minor child is contested, the court
may:

(1) appoint to represent the minor child counsel who
may not represent any party to the action; and

(2) impose against either or both parents counsel fees."

Section 12–103 of the same article permits the court to
award to either party

"the costs and counsel fees that are just and proper under
all the circumstances in any case in which a person:

(1) applies for a decree or modification of a decree
concerning the custody, support, or visitation of a child of
the parties; or

(2) files any form of proceeding:

(i) to recover arrearages of child support; or

(ii) to enforce a decree of child support."

■ This litigation began as, and remained, one in which the amount of child support for Pamela was contested. DSS was seeking an increase; David, with Bonnie's apparent acquiescence, urged that the court terminate his obligation for support. In its course, part of the action became a proceeding to recover arrearages from David and to enforce the initial 1982 order based upon his agreement to pay support. Under these circumstances, the authority of the court to appoint counsel for Pamela and to impose the fee against either parent was clear. Indeed, given the unusual request made by the parents and the dramatic and irreversible effect on the child if that request were to be granted and sustained, it would have been an abuse of discretion not to appoint counsel for Pamela. David's argument that the court erred in making the appointment is therefore rejected.

■ Normally, when a court appoints counsel for a child and assesses the cost against a party to the action, that assessment will not be disturbed on appeal unless the appellate court finds that it constituted an abuse of discretion. *Lopez v. Lopez,* 206 Md. 509, 520–21, 112 A.2d 466, 471 (1955). Section 12–103(b) requires the court, in exercising its discretion, to consider the financial status of the parties, the needs of the parties, and whether there was substantial justification for bringing or defending the proceeding. Quite apart from the statute, those would be the factors that a court would have to consider in any event.

■ There is no indication in this record that the court considered any of those factors; as we indicated, the order setting and assessing the fee was entered without the benefit of a hearing and without any evidence as to David's financial status. We shall therefore remand this aspect of the case as well for further proceedings. In determining who shall pay Mr. Uebersax's fee, the court will have to consider DSS's substantial justification for bringing the initial action and defending against the unwarranted attempt by Bonnie and David to terminate David's parental

obligations as well as the financial circumstances of the respective parties.

JUDGMENT TERMINATING PARENTAL RIGHTS OF APPELLEE EDELMANN REVERSED; ORDER OF AUGUST 24, 1989 VACATED; CASE REMANDED TO CIRCUIT COURT FOR CARROLL COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; APPELLEE EDELMANN TO PAY THE COSTS.